UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
SOPHIA CHINEMEREM IHUOMA EZE,

                Plaintiff,

              -against-

THE CITY UNIVERSITY OF NEW YORK
AT BROOKLYN COLLEGE, et al.,


                Defendants.
----------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

11 CV 2454 (MKB)(CLP)

On September 13, 2011, plaintiff Sophia Chinemerem Ihuoma Eze commenced this

action, pursuant to 42 U.S.C. § 1983, against the City University of New York ("CUNY") at

Brooklyn College ("Brooklyn College" or the "College"), Karen Lee Gould, as President of the

College, Milga Morales, as Dean of Student Affairs of the College, Brooklyn College Campus

and Community Safety Services ("BCCCSS"), Donald Wenz, Director, Ursula G. Chase, Deputy

Director, Harry Gomez, Lieutenant, Cynthia Hunter, Lieutenant, Robert Scott, Liaison

Officer/Coordinator of Honors Academy, Jaime Weiss, Advisor, Sally Robles,[1] Assistant

Professor, John Doe Security Officers Nos. 1-4, and Jane Doe Security Officers Nos. 1-4,

alleging violations of her civil rights based on her involuntary commitment to Kings County

----

[1] Although plaintiff named Sally Robles as the Brooklyn College psychologist who met with plaintiff on December 2, 2008, the parties have stipulated that in fact Michele Munoz was the psychologist who met with plaintiff that day, and that any references in the Amended Complaint to Dr. Robles shall be deemed to refer to Dr. Munoz. (Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated June 27, 2013 ("Defs.' Mem.") at 2, n.2). Any mention of Dr. Robles in papers submitted after the date of the stipulation, February 1, 2012, including this Report and Recommendation, refers to Dr. Robles, and not Dr. Munoz.

Hospital[2] (the "Hospital") against her will. The Complaint also contains claims of negligence against all defendants, negligent hiring and supervision claims against the College, Gould and BCCCSS, and claims of intentional and negligent infliction of emotional distress.

On December 27, 2011, the district court dismissed all claims against Brooklyn College, BCCCSS, and the individual defendants in their official capacities, based on plaintiff's concession that these claims were barred by the Eleventh Amendment. Eze v. City Univ. of New York at Brooklyn Coll., No. 11 CV 2454, 2011 WL 6780652, at *3 (E.D.N.Y. Dec. 27, 2011). Plaintiff also conceded that the statute of limitations had run on her claim for intentional infliction of emotional distress and thus, those claims were dismissed as well. Id.

As for the Section 1983 claims brought against the remaining defendants, Scott and Munoz, in their individual capacity, the district court dismissed the claims stemming from plaintiff's involuntary commitment, finding that the allegations in the Complaint failed to satisfy the plausibility standards of Iqbal and Twombly in that plaintiff failed to allege facts demonstrating that defendants caused plaintiff to be committed. Id. at *6. The court also dismissed the negligence claims against the two defendants, on the grounds that the allegations in the Complaint were only consistent with a Section 1983 claim based on defendants' intentional conduct of restraining and transporting plaintiff to the Hospital. Id. The district court concluded that the only claim remaining against defendants Scott and Munoz was plaintiff's Section 1983 Fourth Amendment claim, arising from the alleged detention of plaintiff at the BCCCSS office

_____

[2]Plaintiff testified that she commenced a separate action against Kings County Hospital. (Deposition of Sophia Chinemerem Ihuoma Eze, dated October 19, 2012 ("Eze Dep."), attached as Exhibit A to the Declaration of Andrew J. Spinnell in Opposition to Defendants' Motion for Summary Judgment, dated August 8, 2013, at 12).

2

and the defendants' role in forcing her into the ambulance. Id. at *5. With respect to that claim, the court concluded that the forcible transport of person to a hospital may violate the Fourth Amendment even where the detention is not committed by a law enforcement officer but rather is at the hands of another state actor, which defendants concede they were at the time of the incident in question. In the decision, the district court noted that neither party had moved for qualified immunity, and that it was not appropriately raised on a motion to dismiss, but that in a case like this, qualified immunity would be appropriate at the summary judgment stage if "the detention and forcible transport of the plaintiff was objectively reasonable under the circumstances." Id. at *5, n.5.

On August 22, 2013, defendants Scott and Munoz filed this motion for summary judgment on the remaining claim, which was referred to the undersigned to prepare a Report and Recommendation. For the reasons set forth below, it is respectfully recommended that defendants' motion be granted.


FACTUAL BACKGROUND

A. Undisputed Facts

It is undisputed that plaintiff Eze is a Nigerian national who came to the United States in October 2007 to study at Brooklyn College.[3] (Defs.' 56.1 Stmnt ¶ 1; Pl.'s 56.1 Stmnt[4] ¶ 1).

---

[3]Brooklyn College is a senior college within the City University of New York. (Defendants' Local Civil Rule 56.1 Statement in Support of Their Motion for Summary Judgment, dated June 27, 2013 ("Defs.' 56.1 Stmnt") ¶ 1).

[4]Citations to "Pl.'s 56.1 Stmnt" refers to Amended Plaintiff's Local Civil Rule 56.1 Counter-Statement in Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2013.

From the Fall of 2007 through the Fall semester of 2008, Ms. Eze was enrolled in the Macauley Honors College as an undergraduate student at Brooklyn College. (Defs.' 56.1 Stmnt ¶ 2; Pl.'s 56.1 Stmnt ¶ 1).

From 1996 through 2011, defendant Robert Scott was employed as Coordinator of the Honors Academy, a unit of Brooklyn College that housed the Macauley Honors College. (Defs.' 56.1 Stmnt ¶ 3; Scott Decl.[5] ¶ 2). According to Mr. Scott, as Coordinator, he served as a resource for students in the honors programs, providing information regarding academic programs, housing, and services. (Scott Decl. ¶ 2). Mr. Scott states that he met with Ms. Eze on numerous occasions in 2007 and 2008, and, because she had just arrived from Nigeria, he tried to help her find services and get acquainted with Brooklyn. (Id. ¶ 3).

Defendant Michele Munoz is a licensed psychologist and certified psychoanalyst with a doctorate in clinical psychology from St. John's University. (Defs.' 56.1 Stmnt ¶ 4; Munoz Decl.[6] ¶ 1). According to her Declaration, Dr. Munoz has been employed by Brooklyn College on a part-time basis since January 2006, providing counseling services and clinical supervision in the College's Personal Counseling Center. (Munoz Decl. ¶ 2; Defs.' 56.1 Stmnt ¶ 5). In addition to her private practice and the counseling services she provides to the Brooklyn College students, Dr. Munoz has also taught classes in the mental health counseling master's degree program in the Psychology Department at the College. (Munoz Decl. ¶ 2).

According to defendants, between November 24, 2008 and December 2, 2008, Scott and

---

[5]Citations to "Scott Decl." refer to the Declaration of Robert Scott in Support of Defendants' Motion for Summary Judgment, dated June 26, 2013.

[6]Citations to "Munoz Decl." refer to the Declaration of Michele Munoz in Support of Defendants' Motion for Summary Judgment, dated June 26, 2013.

other officials at Brooklyn College received various emails from Dr. Brenda Henry-Offor, expressing concern about statements plaintiff Eze made to her and about the state of plaintiff's mental health. (Defs.' 56.1 Stmnt ¶ 8; Scott Decl. ¶ 5, Ex. A; Munoz Decl., Ex. A). According to Scott, he had known Dr. Henry-Offor for more than ten years, beginning when she was an undergraduate student at Brooklyn College. (Defs.' 56.1 Stmnt ¶ 7; Scott Decl. ¶ 5). Scott had provided Dr. Henry-Offor with advice in her pursuit of her doctorate in English, and he understood her to be either related by marriage to Ms. Eze or a close family friend. (Scott Decl. ¶ 5[7]). Defendant Scott had also noticed that in the Fall of 2008, Ms. Eze started saying things to him in their meetings that he "found disturbing and caused me to question her grasp of reality." (Id. ¶ 4). Among other things, Ms. Eze had accused her roommates of posting defamatory statements about her on the Internet, but when Scott asked to see the posts, she became evasive, saying that the webpage was no longer available or that she would show him later. (Id.) When he tried to locate the postings, he could not find them. (Id.)

Dr. Henry-Offor first contacted Scott and Dr. Gunja SenGupta, Director of Macaulay CUNY Honors College and professor of history, on November 24, 2008. In that correspondence, she asked Scott and Dr. SenGupta to "please help" and forwarded an email and attachment that she had received from Ms. Eze's mother, Mary Eze. (Defs.' 56.1 Stmnt ¶ 8; Scott Decl. ¶ 6, Ex. A at 17). The email from Mary Eze noted that she and Dr. Henry-Offor had spoken recently about Ms. Eze's "condition," and Mary Eze expressed concern about "FRIGHTENING

---

[7]Although Ms. Eze responded to the assertion in Defendants' 56.1 Statement that Brenda Henry-Offor was a friend to plaintiff's family, by denying knowledge of the truth or falsity of this statement (Pl.'s 56.1 Stmnt ¶ 2 (denying Defs.' 56.1 Stmnt ¶ 6)), Ms. Eze later conceded at her deposition that Dr. Henry-Offor was "the lady that assisted me to come over from Nigeria . . ." (Eze Dep. at 92), and that they are not related but "she's more like a family friend." (Id. at 93).

UNCO[O]RDINATED REMARKS" that plaintiff had posted on Facebook, including one cryptic post that referred to "knives and pen."[8] (Defs.' 56.1 Stmnt ¶ 9; Scott Decl. ¶ 6, Ex. A at 17). Mary Eze said the family was "scared she is alone Night can be very bad," and asked that something "be done fast" because plaintiff might cause harm to herself. (Scott Decl. ¶ 6, Ex. A at 17). She asked about medical intervention, stating, "I hope she will not harm herself," and pleading "Pls something has to be done fast. Is she on therapy already? Are there any medications?" (Id. at 17).

On November 29, 2008, Dr. Henry-Offor sent Scott and Dr. SenGupta a second email expressing her own concerns about the plaintiff's mental state. Dr. Henry-Offor reported that after plaintiff spent Thanksgiving with family friends in the Bronx, plaintiff reported to Dr. Henry-Offor that the friends were taping plaintiff's conversations. (Munoz Decl., Ex. A at 25). Additionally, according to plaintiff, plaintiff's landlord had bugged her room and installed a monitoring system so "that the men upstairs can see her."[9] (Defs.' 56.1 Stmnt ¶ 10; Munoz Decl., Ex. A at 25). According to Dr. Henry-Offor, plaintiff had told her that she was looking for "a private detective to help her find the blog that her former roommates . . . put up and take

---

[8]The attachment from Mary Eze contains quotations from fourteen of plaintiff's Facebook posts from that week. Many appear to be incoherent ramblings but, in addition to the one referring to "knives and pens," there is a worrisome post that stated, "But then.... it is but a law of nature... when the body appears dead then the vultures are sighted!!!LOL!!" (Scott Decl., Ex. A at 18).

[9]As noted in the Memorandum and Order issued by the Honorable John Gleeson, dated December 27, 2011, plaintiff alleged in her Amended Complaint that her fears regarding the hidden camera were later confirmed. Eze v. City Univ. of New York at Brooklyn Coll., 2011 WL 6780652, at *1 (citing the Amended Complaint, filed on September 9, 2011 ("Compl."), ¶ 24). However, it is unclear how they "were later confirmed" and she has not presented any such evidence in connection with this motion.

down" and that "[i]f the police does [sic] not take care of the girls she says that she will." (Id.) Dr. Henry-Offor also indicated that plaintiff had spoken with a women's crisis center, which told her she needed a "different kind of help . . . i.e. Psychiatric" and a lawyer, who told her she had no evidence of online defamation, and that she was now looking for help from a private detective. (Id.) In her November 29, 2008 email, Dr. Henry-Offor indicated that she had already contacted New York City's 311 service, which connected her to 911. They advised Dr. Henry-Offor that Brooklyn College should call for an ambulance and have plaintiff taken to the Emergency Room for evaluation and help. (Munoz Decl., Ex. A at 25; Defs.' 56.1 Stmnt ¶ 11).

On Monday, December 1, 2008, Dr. Henry-Offor reported in another email that plaintiff had been calling her "constantly to report that there are two guys above her who spy on her and make jokes about her." (Munoz Decl., Ex. A at 24; Defs.' 56.1 Stmnt ¶ 12). She also stated that plaintiff's landlady had asked her to move out because of the bugging, and that "the landlady is probably scared about what Sophia might do" because "[o]f course, none of this is real." (Munoz Decl., Ex. A at 24). According to this email, Dr. Henry-Offor had spoken to a friend who was "a detective at the 61st Precinct" and that he had recommended that plaintiff get a psychiatric evaluation. (Munoz Decl, Ex. A at 24; Defs.' 56.1 Stmnt ¶ 12).

Dr. Sally Robles, psychologist and Acting Director of the Brooklyn College Personal Counseling Center, responded to Dr. Henry-Offor, stating that "the advice of the detective is sound" and that the Kings County Mobile Crisis Unit could perform an initial evaluation if plaintiff was "not in imminent danger and . . . not at imminent risk of hurting someone else." (Munoz Decl., Ex. A at 23). She asked what plaintiff meant by saying that she would "'take care' of the girls who defamed her if the police don't," and noted that if she had a "plan/intent to

harm these girls," 911 should be called. (Id.)

On December 2, 2008, Dr. Henry-Offor sent a series of emails regarding Ms. Eze. (Defs.' 56.1 Stmnt ¶¶ 13-14). At 9:49 a.m., she sent an email to Scott, Dr. SenGupta, Dr. Robles, and Jacqueline Williams, Assistant Dean of Student Affairs, reporting that she had spoken with plaintiff the night before and that plaintiff "wants the two young women punished," referring to plaintiff's former roommates, and that plaintiff said "they should not be allowed to get away with what they did to her." (Munoz Decl., Ex. A at 22; Defs.' 56.1 Stmnt ¶ 13). At 10:44 a.m., she sent another email to Dr. Robles, Williams, Dr. SenGupta and Scott, in which she stated that she "hop[ed] that someone at Brooklyn C. can help with escorting [Eze] and getting the information to the health professionals." (Munoz Decl., Ex. A at 21; Defs.' 56.1 Stmnt ¶ 14).

At 2:10 p.m., Dr. Robles, who had received a number of Dr. Henry-Offor's emails,[10] wrote to the Dean of Student Affairs, Milga Morales, and recommended that plaintiff be transported to the hospital for a psychiatric evaluation. (Munoz Decl., Ex. A at 20; Defs.' 56.1 Stmnt ¶ 15). Dr. Robles noted in the email that Ms. Eze had "refused previous referrals to the counseling center," and thus, it was "extremely unlikely" that she would come to the counseling center on her own. (Munoz Decl., Ex. A. at 20). Dr. Robles stated that if Eze was seen on campus and did not go to the counseling center voluntarily, she should be transported to Kings County Hospital. (Id.) Finally, Dr. Robles suggested that if Ms. Eze did not come to campus, 911 should be called so that an ambulance could be sent to her home to take her for an evaluation by a psychiatrist. (Id.) Dr. Robles warned that because transport to Kings County Hospital "will

---

[10]Williams referred Dr. Henry-Offor to Dr. Robles by email dated December 1, 2008. (Munoz Decl., Ex. A at 22-23).

8

likely be involuntary . . . Campus Security and 911 will likely have to be called." (Id.)

Shortly after receiving Dr. Robles' email, Dean Morales contacted Ursula Chase, Deputy Director of BCCCSS, by telephone and spoke to her, along with Scott and an attorney employed by Brooklyn College, Pamela Pollack.[11] (Chase Decl.[12] ¶ 2; Defs.' 56.1 Stmnt ¶ 16). During that call, Dean Morales informed Chase that Brooklyn College officials had received reports that plaintiff was exhibiting paranoid behavior. (Chase Decl. ¶ 2; Defs.' 56.1 Stmnt ¶ 17). According to Chase, she was told that the people sending the reports knew the plaintiff and were concerned that she might try to harm herself or her former roommates. (Chase Decl. ¶ 2; Defs.' 56.1 Stmnt ¶ 17). During the call, Dean Morales, Chase, and the College's lawyer, Pollack, discussed the need to have plaintiff evaluated by staff at the College or sent for a psychiatric evaluation. (Chase Decl. ¶ 4; Defs.' 56.1 Stmnt ¶ 17). At 2:18 p.m., Dean Morales forwarded to Chase the November 29, 2008 through December 2, 2008 emails previously sent by Dr. Henry-Offor, in which Dr. Henry-Offor expressed her concerns about plaintiff's mental state. (Chase Decl., Ex. A; Defs.' 56.1 Stmnt ¶ 18).

Later that afternoon of December 2, 2008, Dr. Munoz met with Dr. Robles and with Dr. Shirley Puchkoff, a psychologist employed in the Personal Counseling Center; together, they reviewed the emails received from Dr. Henry-Offor. (Munoz Decl. ¶ 4; Defs.' 56.1 Stmnt ¶ 19). The three psychologists concluded, based on the information they had received, that plaintiff may

---

[11]Pollack, the College's lawyer, had received copies of some of the emails, which were forwarded to her by Dean Morales on December 2, 2008 at 2:11 p.m. (Munoz Decl., Ex. A at 20).

[12]Citations to "Chase Decl." refer to the Declaration of Ursula G. Chase in Support of Defendants' Motion for Summary Judgment, dated June 24, 2013.

have been experiencing "a thought disorder with paranoid delusions that affected [plaintiff's] ability to judge what was real." (Munoz Decl. ¶ 5; Defs.' 56.1 Stmnt ¶ 20). Based on this analysis and plaintiff's reported statements about wanting to "punish" her former roommates, Dr. Robles, Dr. Puchkoff, and Dr. Munoz determined that the best course of action was to have plaintiff evaluated by a psychiatrist; they were concerned that she might attempt to harm herself or her former roommates. (Munoz Decl. ¶ 5; Defs.' 56.1 Stmnt ¶¶ 20, 21).

On December 2, 2008, at approximately 3:40 p.m., plaintiff voluntarily went to the BCCCSS office to file an incident report with a campus public safety officer, Sgt. Karen Samuels. (Defs.' 56.1 Stmnt ¶¶ 22, 23; Chase Decl., Ex. B; Eze Dep. at 34, 40, 53). The report, which was prepared by Sgt. Samuels based on plaintiff's statements, states that according to plaintiff: "she sometimes hears people on the street comment on her actions inside her room;" "her former [roommates] posted defamatory blogs about her on myspace.com;" she "heard two strangers on campus . . . laugh and say that's Sophia;" and she claimed to receive calls from unknown numbers on her cell phone. (Chase Decl., Ex. B; Defs.' 56.1 Stmnt ¶ 24).[13] Plaintiff also reported that "people [were] listening in on her cell phone conversations." (Chase Decl., Ex. B; Defs.' 56.1 Stmnt ¶ 24).

When Samuels notified Chase that plaintiff was at the BCCCSS office filing this report, Chase contacted Dr. Munoz, who told Chase to keep plaintiff occupied and to call Scott. (Chase Decl. ¶¶ 6, 7; Munoz Decl. ¶ 7; Defs.' 56.1 Stmnt ¶¶ 25, 26, 27). Dr. Munoz believed that Scott might be able to persuade plaintiff to cooperate in going to the hospital. (Chase Decl. ¶ 7;

---

[13]Although plaintiff does not dispute the fact that she went to the BCCCSS office voluntarily to file a report, she does dispute the accuracy of the statements recorded by Samuels. (Eze Dep. at 34, 40).

Munoz Decl. ¶ 7; Defs.' 56.1 Stmnt ¶ 27).  After Samuels finished taking plaintiff's report, she

brought plaintiff to Chase's office as per Chase's request.  (Chase Decl. ¶¶ 5, 7; Eze Dep. at 51,

54; Defs.' 56.1 Stmnt ¶¶ 28, 29).  Plaintiff waited in Chase's office for a short time before

meeting with Dr. Munoz and Scott, sometime between 4:00 and 4:20 p.m.  (Eze Dep. at 56, 61;

Defs.' 56.1 Stmnt ¶¶ 30, 31).  According to defendants, Ms. Eze then went voluntarily into the

ambulance.  (Chase Decl. ¶¶ 9, 10; Scott Decl. ¶ 10; Munoz Decl. ¶ 11).  On December 2, 2008,

plaintiff executed an application for voluntary admission to Kings County Hospital, and she was

admitted as a patient in the psychiatric unit, where she remained for more than two weeks until

her discharge on December 19, 2008.  (Eze Dep. at 146-148, 179; Defs.' 56.1 Stmnt ¶¶ 37, 38).


B. Plaintiff's Claims

Plaintiff does not dispute the vast majority of facts set forth in defendants' motion papers.

(See Pl.'s 56.1 Stmnt).  Although she does dispute defendants' claim that she went voluntarily

into the ambulance (Eze Aff.[14] ¶¶ 22, 23, 32), she does not dispute that the College officials

received the emails from Dr. Henry-Offor and Mary Eze, nor does she even dispute the fact that

she reported many of the things described in Dr. Henry-Offor's emails.

Plaintiff does dispute certain details of what she allegedly said to other people or she

draws different inferences from what occurred.  At times, her statements in her Affidavit and her

deposition testimony are inconsistent.  However, plaintiff insists that she never exhibited any

physical signs of being a danger to herself or to others, nor was she suicidal or had any mental

_____

[14]Citations to "Eze Aff." refer to the Affidavit of Plaintiff Chinemerem Ihuoma Eze in
Opposition, dated August 7, 2013.

illness.  (Pl.'s Mem.[15] at 2-3).

In her Affidavit, plaintiff claims that she went to the BCCCSS office on December 2, 2008 to file a report and seek advice regarding the surveillance being conducted by plaintiff's landlady and the male tenant in the apartment above her.  (Id. at 3; Eze Aff. ¶ 4).  She claims that she went to the BCCCSS office because she had rented the room through the College and felt that the College had an obligation to help her, and because she had never before called the police.[16]  (Pl.'s Mem. at 3; Eze Aff. ¶ 4).

Ms. Eze admits that the security officer took down a written report of what Ms. Eze told her.  (Eze Aff. ¶¶ 5, 6).  However, during her deposition, Ms. Eze denied making certain statements as reported by the security officer.  She denied stating that she heard the landlord's daughter, Nadia, making comments about Ms. Eze's actions, even though she later admitted in her deposition that the landlord had a daughter named Nadia.[17]  (Compare Chase Decl., Ex. B with Eze Dep. at 106-07).  Ms. Eze also denies telling the security guard that she sometimes hears people on the street commenting about her, instead claiming that she told the security guard about the incident where she overheard the two people mentioning her name as being all over the Internet.  (Compare Chase Decl., Ex. B with Eze Dep. at 107-08).  Although plaintiff admits in

---

[15]Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated August 8, 2013.

[16]In her deposition, however, she admitted that she had actually gone to the police previously to report several incidents where she claimed men "at two subway stations and on the streets" had allegedly attacked her.  (Eze Dep. at 134).  (See discussion infra at 18).

[17]Plaintiff does not explain why the security officer would have included this statement in the report or how the officer would even have known about "Nadia" if Ms. Eze had not mentioned Nadia in the conversation.

her deposition that she told the security officer that "'she was aware of the blog two months ago and has not seen it'" (Eze Dep. at 112 (quoting Chase Decl., Ex. B)), she denies telling the officer that "every time [she] tried to go online looking for the blog, someone says Sophia is online and removes the blog."[18] (Id. at 114). She also denies telling the security officer that people were listening in on her cell phone conversations (id. at 114-16), instead testifying that what she said was that her calls were being "misdirected." (Id. at 115).

In her Affidavit, Ms. Eze states that after she filled out the Report, she was questioned by a school psychologist, Dr. Munoz, until she told the psychologist that she wished to leave the room. (Eze Aff. ¶¶ 5, 6). Plaintiff testified that during this meeting, Dr. Munoz questioned plaintiff regarding her mental state, but that Scott did not speak to plaintiff at all. (Eze Dep. 61, 63-64; Defs.' 56.1 Stmnt ¶¶ 31, 32). When she told Dr. Munoz that she had a group presentation in Manhattan on the handling of advanced biodegradation of waste material, Dr. Munoz told her that she was not going anywhere and that they were getting an ambulance. (Eze Aff. ¶ 7). At this point, Ms. Eze declared that she no longer wanted to be enrolled in Brooklyn College and that there was nothing wrong with her. (Id.) Plaintiff claims that she was subjected to a "confusing, frightening, and humiliating ordeal," where she was asked "very personal questions" in front of a school administrator – which she contends violates HIPAA – and was "confined against her will." (Pl.'s Mem. at 3). After approximately 15 minutes, a security officer notified Dr. Munoz that an ambulance had arrived. (Eze Dep. at 63, 68; Defs.' 56.1 Stmnt ¶ 34). According to plaintiff, Scott, Dr. Munoz, Chase and two female security officers took plaintiff to

---

[18]Despite her current denial, this statement in the report is consistent with what Ms. Eze told Dr. Henry-Offor about the Internet comments being put up and taken down. (Munoz Decl., Ex. A at 25).

the ambulance that then transported her to Kings County Hospital. (Eze Dep. at 71-72, 74; Defs.' 56.1 Stmnt ¶ 35). Despite her repeated protestations and requests to leave, plaintiff claims that defendants forced her into the ambulance. (Pl.'s Mem. at 7; Eze Aff. ¶ 9). Plaintiff testified that although Scott rode with her in the ambulance to the hospital, he did not speak to her. (Eze Dep. at 73; Defs.' 56.1 Stmnt ¶ 36).

Plaintiff disputes defendants' claim that she went voluntarily to the ambulance and she claims that she never agreed to go to the hospital. (Eze Dep. at 69). As for Ms. Chase's statements, Ms. Eze denies that "no force" or "threat of force" was used against her. (Eze Aff. ¶ 23). She further claims that once at Kings County Hospital, she was handed over to a doctor and "forced and induced through lies to sign myself into the psychiatric ward where I remained trapped against my will for approximately two weeks without justification." (Eze Aff. ¶ 10; see also Eze Dep. at 146-47 (admitting to having read the admission form and admitting to her signature on the form, but claiming that she was told that if she didn't sign it, she would not be "let . . . out immediately")). She conceded that she met with the doctor every day and told him she wanted to leave. (Eze Dep. at 75). She also testified that the doctor believed she was exhibiting "symptoms of schizophrenia," but she denies that this was the truth. (Id. at 156). She also denies receiving medication at the Hospital, although she admitted that she was given a bottle upon discharge, which she has never opened. (Id. at 176).

Ms. Eze does not dispute the statements in the various emails regarding her claims that her landlady was spying on her. In her Affidavit, Ms. Eze explains that she had found a hidden video camera in the ceiling vent of the basement room she was renting at New York Avenue, and she feared that she was being watched by the landlady and the man in the apartment above her.

14

(Eze Aff. ¶ 4; Eze Dep. at 41, 43). During her deposition, she testified that "[w]ithin the first month I moved in I suspected that there was a camera in my room." (Eze Dep. at 45). Ms. Eze testified that "when I come from the bedroom and I'm dressing or something, I hear the – this man that was living upstairs with the landlady . . . commenting on my – my body form and everything." (Eze Dep. at 41).[19] She claims that she discovered that "there was actually a video camera in the vent there." (Id. at 42). According to her testimony, Ms. Eze looked through the vent with a flashlight but did not attempt to open the vent, "because I would have to break it out." (Id. at 43). When she spoke to the landlady, her response was "like, what am I talking about and everything like that . . . . She was like that I will have to move out." (Id. at 44).

Ms. Eze discounts her mother's email referring to Ms. Eze's "'frightening uncoordinated remarks,'" which Mary Eze stated "'sound really dangerous,'" contending that her mother had no psychological training and was just expressing "anxiety over a daughter who left home and country." (Eze Aff. ¶ 15). Plaintiff contends that Scott also "overreact[ed] to my statements to him," and that his conclusions that she might have acted to harm her former roommates is "pure conjecture on his part." (Id. ¶¶ 16, 18).

Plaintiff also questions how Dr. Munoz could have stated that Ms. Eze was exhibiting "some paranoia" when she never "formally evaluated and tested" plaintiff, contending that her conclusions were not reasonable because they were based on "hearsay." (Id. ¶ 26). As for the emails from Dr. Henry-Offor, plaintiff contends that her interpretation of the Facebook comment

---

[19]When asked later in the deposition exactly what the man said that led her to believe he was spying on her, Ms. Eze testified, "Oh, some stuff like look at her body, da, da, da, da, or what I eat today. Oh, you want to eat all of them . . . ." (Eze Dep. at 48). She testified that she never confronted the man; "It was like I saw the camera there. It was not for me. I wanted it out." (Id.)

– about choosing "between the pen and the knife" – which Dr. Munoz believed suggested potential harm to plaintiff or others, "is so far fetched from reality that I am about to laugh." (Id. ¶ 27). Plaintiff claims that this was her way "of expressing my desire to decide between a career in creative writing and a career in medicine." (Id.)

Plaintiff also explains her situation with her ex-roommates, who she claimed "bullied and yelled at me frequently about using too much electricity" and about the smell of her cooking.[20] (Id. ¶ 35; Eze Dep. at 79, 81). She claims that although they wanted her to move out, she had paid her rent and did not want to leave. (Eze Aff. ¶ 35; Eze Dep. at 81-82). She claims that one of them "pulled a knife on me . . . and threatened to kill me" and that they threatened to post defamatory comments about her on the Internet. (Eze Aff. ¶ 35). In her deposition, she testified that they threatened that "they're going to put stuff about me on the Internet. They're going to do da, da, da, da. I don't know what you're really going to do . . . . So that's what they always saying, something about people hate you and stuff like that. Da, da, da, da. Just saying some different things." (Eze Dep. at 83). She claims these threats from both roommates to post things on "MySpace, You Tube" occurred "more than once . . . . [T]hey kept bringing it up again and again . . . ." (Id. at 88-89). She admits that no one witnessed the incident with the knife (id. at 86), and she claims that she did not report the incident with the knife to the police because she

_____

[20]When asked at her deposition about this, Ms. Eze testified that one of the roommates told her she had to leave, "that I'm using up too much electricity. That the things I cook in the house, my cooking, she doesn't like the way it smells and da, da, da, da." (Eze Dep. at 81). Ms. Eze claims that the roommate "started flinging out plates, all of my dishes out of the windows. She grabbed a knife and she was going to stab me with it . . . . [S]he called Amanda [the other roommate] on the phone and told Amanda I'm going to kill her. I'm going to kill this girl. Da, da, da, da, da," to which Ms. Eze responded that she did not have anywhere to go and she had an exam the next day. (Id. at 82-83).

had only been in the country for eight months.  (Id. at 84).

Despite Mr. Scott's and Dr. Henry-Offor's statements that plaintiff told them the roommates had posted such statements (see Scott Decl. ¶ 4; Munoz Decl., Ex. A at 25), in her Affidavit, plaintiff now claims that "[t]o this day, I don't know if they actually went through with it." (Eze Aff. ¶ 36).  When asked during her deposition if the roommates ever in fact posted anything about her, Ms. Eze testified, "Well, I would say that there was – there was actually an incident when I was on campus going home from school and somebody like laugh." (Eze Dep. at 89).  A girl then told Ms. Eze that "you're all over the Internet or something like that."  (Id. at 90).  Ms. Eze testified that this incident occurred in September 2008, but that she "ha[dn't] found it," referring to the Internet post.  (Id. at 91, 92).  She then stated that, "[I]t wasn't like a concern. It was, it was.  I mean, somebody say I'm going to put something about you on the Internet.  I don't know what it was."  (Id. at 91-92).  However, when pressed, Ms. Eze claimed that she has never actually found anything on the Internet about her.  (Id. at 91).

During her deposition, Ms. Eze admitted that she had discussed the problems she was having with her roommates with Dr. Henry-Offor, including the knife incident and the threats made by the roommates to post things about her on the Internet.  (Id. at 96-97).  She also admitted telling Dr. Henry-Offor about the remarks made by students she did not know regarding postings on the Internet (id.), and about her concerns that people were spying on her in her New York Avenue apartment.  (Id. at 97).

Plaintiff claims, however, that she did not tell her mother about the threats made by her former roommates, but admitted that she did discuss the situation with her mother after Dr. Henry-Offor told Mary Eze about it.  (Id. at 98-99).  Ms. Eze also told her mother that she

believed someone was spying on her in her New York Avenue residence. (Id.) However, Ms. Eze denies ever threatening her roommates or anyone with bodily harm; she denies any history of psychiatric problems, and claims she has no history of violence. (Eze Aff. ¶ 11).

In her deposition, Ms. Eze was questioned about certain of the emails sent by Dr. Henry-Offor to the College officials. When asked to verify the accuracy of Dr. Henry-Offor's comment that plaintiff "calls me constantly" to report the "two guys" who were spying on her, plaintiff hedged her answer, eventually testifying that maybe she mentioned it on the phone and then again when she visited Dr. Henry-Offor on the weekend. (Eze Dep. at 119-22). She also admitted telling Dr. Henry-Offor that her roommates taped her phone calls and in fact taped all their incoming and outgoing calls.[21] (Id. at 123).

When asked about an email she had received from Dr. SenGupta indicating that because of her grades, Ms. Eze would "be dismissed at the end of the spring semester and then will have to leave" (id. at 130), Ms. Eze denied that she was facing expulsion, noting that even if her grade point average was 3.0, and she was required to maintain a 3.5, she could still continue at the College, but not in the honors program. (Id. at 130-31).

Ms. Eze was also questioned about an email in which Dr. Henry-Offor reported to Scott and Dr. SenGupta that plaintiff "reported that she went to the police station to report on attacks by men at two subway stations and on the streets." (Id. at 134). Ms. Eze admitted that she had made such reports in the beginning of November 2008, but she did not obtain a copy of the police report. (Id. at 137-38).

_____

[21]This appears to be consistent with the statement made to the security officer, which plaintiff now denies as accurate. (Eze Dep. at 115).

Following the completion of discovery, defendants Scott and Munoz moved for summary judgment on plaintiff's remaining Fourth Amendment claim, seeking damages against them in their personal capacity, arguing that: 1) the detention of plaintiff[22] incidental to her transport to the Hospital for a psychiatric evaluation did not violate the Fourth Amendment because defendants reasonably believed that plaintiff might harm herself or others; and 2) defendants are entitled to qualified immunity. For the reasons set forth below, this Court respectfully recommends that defendants' motion for summary judgment be granted.

DISCUSSION

A. Summary Judgment Legal Standard

It is well-settled that a party moving for summary judgment has the burden of establishing that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 114 (2d Cir. 2010). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that "[s]ummary judgment is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195

---

[22]Although defendants deny that they restrained plaintiff against her will on December 2, 2008, defendants have accepted as true for purposes of the summary judgment motion plaintiff's claims that she was detained. (Defs.' Mem. at 2-3, n.3).

(N.D.N.Y. 1983) (alteration in original) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011), cert. denied, 132 S. Ct. 2439 (2012).

Once the moving party discharges its burden of proof, the party opposing summary judgment has the burden of setting forth "specific facts showing that there is a genuine issue for trial," wherein "a reasonable jury could return a verdict for the non-moving party." International Bus. Machines Corp. v. BGC Partners, Inc., No. 10 CV 128, 2013 WL 1775367, at *4 (S.D.N.Y. Apr. 25, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original).

Federal Rule of Civil Procedure 56 provides that, in moving for summary judgment or responding to such a motion, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). While the Court need consider only the materials

cited by the parties, it may consider any other materials in the record in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(3).

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The requirement of Rule 56 that affidavits be made on personal knowledge is not satisfied by assertions made "on information and belief." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (citing Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988)). "However, a verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment." Id. (citing Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002)).

B. Failure to Comply with the Local Rules

Defendants contend that because plaintiff failed to comply with the requirement of Local Civil Rule 56.1, in that she failed to file a counter-statement "specifically controvert[ing] the statements of undisputed material fact set forth in defendants' 56.1 Statement, the material facts set forth in defendants' 56.1 Statement should be "deemed to be admitted as a matter of law." (Defs.' Reply Mem.[23] at 2 (quoting Local Civil Rule 56.1(c))).

Local Civil Rule 56.1 of the Southern and Eastern Districts of New York mandates that a

---

[23]Citations to "Defs.' Reply Mem." refer to the Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, dated August 22, 2013.

party making "any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure" is required to file "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. & E.D.N.Y. Local Civ. R. ("Local Rule") 56.1(a). The non-moving party is then required to respond to the statement of uncontested facts by "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" and may also outline in a separate statement the issues of fact still in dispute. Local Rule 56.1(b). Each statement by the movant or the opposing party must include a citation to admissible evidence. Local Rule 56.1(d).

Courts have held that where a party fails to comply with the Local Rules, the court has discretion either to deny the motion in its entirety or to examine the record in determining whether to grant summary judgment. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (quoting Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000) (noting that district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules," and may "opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement"); Sawyer v. Wight,196 F. Supp. 2d 220, 225 (noting that "[w]hile District Courts are 'not required to consider what the parties fail to point out in their . . . 56.1 [S]tatements,' they may discretionarily choose to search the record of their own accord") (internal citations omitted).

In this case, plaintiff initially failed to comply with Local Rule 56.1(b) because she submitted a 56.1 Counter Statement in response to defendants' motion in which she failed to provide citations to admissible evidence in responding to defendants' statement of undisputed

material facts. However, after the defendants raised the issue of the plaintiff's deficient response in their Reply Memorandum, and the parties had fully briefed the summary judgment motion, plaintiff requested and was given leave by the district court to file an amended 56.1 Counter Statement with proper citations.

Although plaintiff did submit an amended 56.1 Counter Statement on August 26, 2013, it still fails technically to comply with the Local Rules, in that it fails to directly contradict many of the allegations made in defendants' 56.1 Statement, or where there is a denial, plaintiff cites no supporting evidence, apart from her own statements. Defendants argue that summary judgment is warranted based on plaintiff's failure to present any admissible evidence, apart from her own testimony, to counter the statements of material fact urged by defendants. See Bilan v. Davis, No. 11 CV 5509, 2013 WL 3940562, at *5 (S.D.N.Y. July 31, 2013) (granting summary judgment for defendant, and finding that the plaintiff had "offer[ed] no admissible evidence . . . other than his own testimony" regarding the defendant's personal involvement, and that was insufficient for a jury to conclude that defendant was involved), report and recommendation adopted, 2013 WL 4455408 (S.D.N.Y. Aug. 20, 2013).

Indeed, a review of the amended Counter Statement demonstrates that plaintiff has conceded the truth of many of the defendants' statements of fact.[24] With respect to all but two of the remaining factual contentions in the defendants' 56.1 Statement, plaintiff responded by simply denying "knowledge and information sufficient to form a belief as to the truth or falsity of

---

[24]She admits to the truth of paragraphs 1, 2, 8, 10, 11, 12, 13, 14, 22, 23, 24, 29, 30, 31, 32, 33, 34, 35, 36, and 37 of Defendants' 56.1 Statement. (See Pl.'s 56.1 Stmnt ¶ 1).

the statement."[25]  (Pl.'s 56.1 Stmnt ¶ 2).  The only statements she directly disputes are

defendants' statement in paragraph 9, which alleged that Mary Eze asked Dr. Henry-Offor to take

action to have plaintiff treated (Defs.' 56.1 Stmnt ¶ 9), and the statement in paragraph 38, in

which she denies defendants' claim that her admission to the Hospital was voluntary.  (Pl.'s 56.1

Stmnt ¶ 4).  Even her denial of paragraph 9 does not actually raise a factual dispute because Ms.

Eze merely presents a different interpretation of the email from Mary Eze.  (Id. ¶ 3).

Specifically, Mary Eze's email to Dr. Henry-Offor states: "Pls something has to be done fast [sic]

. . . . [W]e are hoping that something will be done now to forstall [sic] further deterioration."

(Pl.'s 56.1 Stmnt ¶ 3; Scott Decl., Ex. A at 17).

    Thus, although the plaintiff's Counter Statement sets forth certain facts relating to the

events that occurred in the security office, plaintiff does not controvert the vast majority of the

facts upon which the College officials based their decision that she posed a danger to herself or

others.  Even if her interpretation of the meaning of Mary Eze's email is accepted as accurate,

this statement was not material to the question of whether the defendants had probable cause to

believe plaintiff posed a danger to herself or others because the question requires consideration

of the totality of the circumstances.  Defendants argue that summary judgment is warranted here

because plaintiff does not contest that:  1) Dr. Munoz and two other psychologists from the

College reviewed the emails regarding plaintiff's behavior and statements and concluded that she

may "be experiencing a thought disorder, which affected [her] ability to judge what was real, and

paranoid delusions, and that [she] should be promptly evaluated by a psychiatrist given the

---

[25]Despite conducting extensive discovery in this case, plaintiff denies sufficient
information to respond to paragraphs 3, 4, 5, 6, 7, 15, 16, 17, 18, 19, 20, 21, 25, 26, 27, 28 of
Defendants' 56.1 Statement.  (See Pl.'s 56.1 Stmnt ¶ 2).

potential harm to herself or to others," and 2) the three psychologists were concerned that she might cause harm to herself or others – namely, her former roommates. (Defs.' Reply Mem. at 3 (citing Defs.' 56.1 Stmnt ¶¶ 19-21)).

Since plaintiff's Counter Statement does not specifically controvert the material facts relied upon by defendants, they are deemed admitted as a matter of law. Moreover, while plaintiff has failed to cite admissible evidence in compliance with Local Rule 56.1, see Local Rule 56.1, the Court has conducted its own review of the record, see Holtz v. Rockefeller & Co., Inc., 258 F.3d at 73, and respectfully recommends that summary judgment in favor of the defendants be granted on the merits of defendants' qualified immunity defense.

## C. Claims Under the Civil Rights Laws

Section 1983 prohibits the deprivation of individual rights secured by either the Constitution or the laws of the United States. See Spear v. Town of W. Hartford, 954 F.2d 63, 67 (2d. Cir.), cert. denied, 506 U.S. 819 (1992); Devany v. County of Nassau, No. 88 CV 0657, 1989 WL 18748, at *3 (E.D.N.Y. Feb. 16, 1989). In order to establish a claim under Section 1983, plaintiff must demonstrate that defendants deprived her of a federal right and that the defendants acted under color of state law. 42 U.S.C. § 1983; Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970); Nesbitt v. County of Nassau, No. 05 CV 5513, 2006 WL 3511377, at *2 (E.D.N.Y. Dec. 6, 2006); Kashelkar v. Rubin & Rothman, 97 F. Supp. 2d 383, 389-90 (S.D.N.Y. 2000), aff'd, 1 F. App'x 7 (2d Cir. 2001), cert. denied, 534 U.S. 896 (2001). "'Acting 'under color' of state law is defined as the 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"" Puglisi v.

Underhill Park Taxpayer Ass'n, 947 F. Supp. 673, 703 (S.D.N.Y. 1996) (quoting Monroe v.

Pape, 365 U.S. 167, 184 (1961)), aff'd, 125 F.3d 844 (2d Cir. 1997). Here, the defendants have

conceded that they were acting under color of state law, but dispute plaintiff's claim that she was

deprived of her constitutional rights.

In considering the defendants' motion to dismiss, the district court analyzed plaintiff's

claim under the Fourth Amendment's prohibition against "unreasonable searches and seizures."

Eze v. City Univ. of New York at Brooklyn Coll., 2011 WL 6780652, at *4. Specifically, the

Supreme Court has held that a "seizure" for purposes of the Fourth Amendment occurs when a

government actor "by means of physical force or show of authority . . . restrained the liberty of a

citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); Glass v. Mayas, 984 F.2d 55, 57-58 (2d Cir.

1993). As the district court noted, "the forcible transport of a person to a hospital may violate the

Fourth Amendment," Eze v. City Univ. of New York at Brooklyn Coll., 2011 WL 6780652, at

*4, and the court rejected the defendants' argument that the Fourth Amendment did not apply

because the defendants were not police officers. Id. at *5; see also New Jersey v. T.L.O., 469

U.S. 325, 335 (1985) (holding that "the Fourth Amendment [is] applicable to the activities of

civil as well as criminal authorities: building inspectors, Occupational Safety and Health Act

inspectors, and firemen . . . are all subject to the restraints imposed by the Fourth Amendment")

(internal citations omitted). Indeed, in Glass v. Mayas, the Second Circuit held that the plaintiff

had been "seized" when he was transported against his will to a psychiatric facility by a doctor

and nurse, among others, and held there, involuntarily confined, in accordance with state law.

984 F.2d at 56, 58.

Thus, in connection with this motion, defendants have indicated that they "accept"

plaintiff's claim that she was "seized" when Scott, Dr. Munoz and the public safety officers allegedly blocked Eze from leaving the Deputy Director's office and escorted her to the ambulance on December 2, 2008. (Defs.' Mem. at 9). Defendants argue that there was, however, no violation of plaintiff's constitutional rights because they had a reasonable basis to believe that she should be transported to the Hospital for a psychiatric evaluation because she posed a danger to herself or others. (Id.) They also argue that they are shielded from liability on the grounds of qualified immunity. (Id. at 12).


1) Probable Cause

In her Complaint, plaintiff has alleged that there was no probable cause for defendants to detain her prior to her being transported to the Hospital, and that this detention constituted a violation of her constitutional rights.

For probable cause to exist, an official must have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief" that the person has committed an offense, Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000), or in this case, that plaintiff posed a danger to herself or others. Glass v. Mayas, 984 F.2d at 57. "A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003) (quoting Glass v. Mayas, 984 F.2d at 58; see also Green v. City of New York, 465 F.3d 65, 83 (2d Cir. 2006) (holding that "a competent adult could not be seized and transported for treatment unless she presented a danger

to herself or others"); Esposito v. Quatinez, No. 09 CV 421, 2014 WL 842766, at *8-9 (E.D.N.Y. Mar. 5, 2014) (finding that there was a question of fact as to plaintiff's dangerousness in a Section 1983 suit where the defendant did not examine plaintiff). If there are reasonable grounds for believing the person is a danger, then an involuntary hospitalization does not violate the Fourth Amendment. See Fisk v. Letterman, 501 F. Supp. 2d 505, 526-27 (S.D.N.Y. 2007) (relying on doctor's determination of dangerousness to find that involuntary hospitalization did not violate the Fourth Amendment).

### 2) Qualified Immunity - Legal Standard

Turning to the standards to be applied to defendants' claimed defense of qualified immunity, it is well settled that government officials are protected from civil actions brought against them in their personal capacity when the claims "aris[e] from the performance of their discretionary functions [and] when that performance 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cartier v. Lussier, 955 F.2d 841, 843 (2d Cir. 1992) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Coollick v. Hughes, 699 F.3d 211, 220 (2d Cir. 2012) (internal quotation marks omitted). "[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Weyant v. Okst, 101 F. 3d 845, 857 (2d Cir. 1996). This determination does not depend on an inquiry into the official's subjective personal belief, but instead "generally turns on the 'objective . . . reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time the action was

taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (citing Harlow v. Fitzgerald, 457 U.S. at 818)); see also Cartier v. Lussier, 955 F.2d at 843. An official's conduct violates "clearly established law" where the right violated is clear such that "*every* reasonable official would have understood that what he is doing violates that right." Coollick v. Hughes, 699 F.3d at 220 (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted)).

Thus, even if an official did not have probable cause, qualified immunity may still apply. Courts apply the "arguable probable cause" standard, wherein either "it was objectively reasonable for the [official] to believe that probable cause existed" or "officers of reasonable competence could disagree on whether probable cause existed." 5 Borough Pawn, LLC v. City of New York, 640 F. Supp. 2d 268, 289 (S.D.N.Y. 2009) (citing Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). The qualified immunity analysis "presupposes a constitutional violation, but excuses it on the ground that no reasonable [official] in the defendant's situation would have known that he was violating the plaintiff's rights." Mittelman v. County of Rockland, No. 07 CV 6382, 2013 WL 1248623, at *16 (S.D.N.Y. Mar. 26, 2013).

Defendants argue that based on the information available to Scott and Dr. Munoz, there was probable cause to believe that Ms. Eze posed a risk of danger to herself or others. However, the existence of probable cause is a question for the jury where there is a dispute regarding the events leading to the seizure, and where the question is factual in nature. See, e.g., Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997); Weyant v. Okst, 101 F.3d at 852; Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir. 1994). See also Collom v. Incorporated Vill. of Freeport, N.Y., 691 F. Supp. 637, 640 (E.D.N.Y. 1988) (noting that "where the evidence is conflicting such that reasonable persons might draw differing inferences, then the question of probable cause is

ordinarily for the jury to decide") (citations omitted).

By contrast, the question of qualified immunity "is a mixed question of law and fact . . . . Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material . . . facts, if there is such a dispute, [it] must be resolved by the factfinder." Taravella v. Town of Wolcott, 599 F.3d 129, 134-35 (2d Cir. 2010) (quoting Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004)). As the court in Cartier v. Lussier noted, "[t]he Supreme Court has expressly encouraged the use of summary judgment when qualified immunity is raised as a defense." 955 F.2d at 844. Qualified immunity "represents the norm" for officials. Anderson v. Creighton, 483 U.S. at 642. Therefore, if no material factual disputes relating to the applicability of the doctrine exist in the case, summary judgment is warranted.


3) Analysis

Although the law is well-established that detention of a person constitutes a violation of that person's rights, defendants may successfully assert a defense of qualified immunity if they can establish that "[officials] of reasonable competence could disagree" on whether probable cause is met – in this case, on whether plaintiff posed a danger to herself or others. Escalera v. Lunn, 361 F.3d at 743; Glass v. Mayas, 984 F.2d at 58. In the case of involuntary commitment, "[c]ourts have routinely granted summary judgment where there is no indication that defendants' decision to commit a plaintiff fell substantially below medical standards." Mittelman v. County of Rockland, 2013 WL 1248623, at *25 (internal citation and quotation marks omitted) (noting that although plaintiffs disputed the "veracity" of the information available to officers when

committing plaintiffs, they did not raise a triable issue of fact as to the officers' access to the information or its reliability); see also Fisk v. Letterman, 501 F. Supp. 2d at 526-27.

Here, based on the undisputed facts, plaintiff has not presented any evidence or authority to support a claim that defendants' decision "fell substantially below medical standards." Mittelman v. County of Rockland, 2013 WL 1248623, at *25. Nor has there been any showing that defendants misconstrued or ignored the legal standard under which they decided to seize the plaintiff. Defendants argue that they should not be held liable because an objectively reasonable official would have concluded under the circumstances that she posed a danger to herself or others.

As noted supra, because plaintiff has not disputed the facts that are material to defendants' qualified immunity defense, the question becomes a question of law for the court – was it objectively reasonable for the College psychologists reviewing these emails to conclude that Ms. Eze posed a danger? Thus, plaintiff does not dispute that Dr. Henry-Offor sent a number of emails to Scott and other College officials during the period between November 24, 2008 and December 2, 2008. These emails detail increasingly disturbing information regarding statements plaintiff had allegedly made to Dr. Henry-Offor, including plaintiff's claim that people were monitoring her behavior, spying on her through a video camera, whispering and laughing about her, and taping and interfering with her phone calls. (Munoz Decl., Ex. A at 25). It is also undisputed that plaintiff's own mother, Mary Eze, sent an email to Dr. Henry-Offor, expressing concern about references on plaintiff's Facebook account to "knives and pens," which Mary Eze described as "FRIGHTENING," as well as raising the concern that plaintiff might harm herself. (Munoz Decl., Ex. A; Scott Decl., Ex. A at 17). It is also undisputed that on

December 2, 2008, Dr. Henry-Offor's email to Scott represented that plaintiff had made comments about her former roommates, and that Dr. Henry-Offor communicated to College officials her concern that plaintiff "wants the two young women punished." (Munoz Decl., Ex. A at 22). Dr. Henry-Offor indicated in the emails that she was so concerned about plaintiff's well-being that she contacted New York City's 311 service, as well as the police department, and was told that plaintiff should be taken to the hospital for evaluation. (Id. at 25). Similarly, plaintiff's mother's email had also expressed the fear that plaintiff might be considering "tak[ing] care" of her former roommates. (Id.)

While plaintiff does not dispute these facts, she raises a number of arguments to support her claim that defendants' detention was unreasonable. First, she argues that it was unreasonable for the College officials to rely on Dr. Henry-Offor's emails because the information Dr. Henry-Offor provided was based on hearsay statements made by plaintiff and plaintiff's mother. (Pl.'s Mem. at 9-11). Plaintiff asserts that a reasonable official in defendants' position would not rely on hearsay to form an opinion as to something as serious as detention. (Id. at 11, 17). Accordingly, plaintiff concludes that defendants' evaluation was unreasonable. (Id.)

However, it is well-established that hearsay information can be used as the basis for establishing probable cause when "there exists a reasonable basis to credit the information." Batson-Kirk v. City of New York, No. 07 CV 1950, 2009 WL 1505707, at *6 (E.D.N.Y. May 28, 2009). Moreover, when making a determination of whether probable cause exists based on the statements of a confidential informant, the Second Circuit has held that the court should examine "the totality of the circumstances," United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993), see also McColley v. County of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014), and in doing so, "may

consider . . . 'an informant's veracity, reliability and basis of knowledge,' and the extent to which an informant's statements . . . are independently corroborated." United States v. Gagnon, 373 F.3d 230, 235 (2d Cir. 2004); see also McColley v. County of Rensselaer, 740 F.3d at 823.

Here, it was entirely reasonable for defendants to consider Dr. Henry-Offor's representations as to what plaintiff was saying and to rely on those statements in analyzing plaintiff's mental state. Defendant Scott had known Dr. Henry-Offor for over ten years and knew that she was a family friend of Ms. Eze's. Even though Ms. Eze now denies the accuracy of Dr. Henry-Offor's statements, she admitted in her deposition that Dr. Henry-Offor knew her family and arranged for Ms. Eze to come to the United States to study at the College. (Eze Dep. at 92-93). This knowledge of Dr. Henry-Offor prior relationship with Ms. Eze and her family suggests a certain degree of reliability to her reporting, and indeed, plaintiff has presented no evidence to suggest that anything known to the defendants at the time would lead them to question the veracity of Dr. Henry-Offor's statements. Additionally, Ms. Eze's own mother's expressed concerns, which Dr. Henry-Offor forwarded to school officials, provided corroboration for Dr. Henry-Offor's account of events. Although Ms. Eze now argues that her mother simply overreacted and was expressing concern about a daughter studying abroad, nothing has been provided to show that the College officials were aware of this at the time or that they had any reason to question the plaintiff's own mother's concerns.

Additionally, Scott's own observations of plaintiff's odd behavior in her interactions with him provided independent corroboration of Dr. Henry-Offor's concerns. Consistent with the emails sent by Dr. Henry-Offor, plaintiff told Scott that her roommates were posting defamatory things about her on the Internet, but when Scott asked to see the posts, she became evasive,

saying that the webpage was no longer available or that she would show him later. (Scott Decl. ¶ 4). When he searched, he was unable to locate any such postings. (Id.) Although Ms. Eze's deposition testimony now suggests that the roommates may never have posted about her on any blogs, her testimony contradicts itself in many instances, and she does not deny that she told Scott that her roommates were threatening to post these defamatory statements on the Internet. (See discussion supra at 16-17).

Plaintiff does not dispute the facts underlying the defendants' analysis of the emails presented by Dr. Henry-Offor, and although she now presents an alternative explanation, given the facts known to defendants at the time and the independent credibility of Dr. Henry-Offor, it was not objectively unreasonable for defendants to rely on her representations in conjunction with their own evaluation.

Plaintiff also argues that the defendants' interpretation of events was not accurate. Instead, plaintiff offers several alternative explanations for the statements she reportedly made. Plaintiff contends that defendants "totally misunderstood" plaintiff's "Haiku-like" statements on her Facebook page.[26] (Pl.'s Mem. at 10). Plaintiff also argues that it was not reasonable to rely on Dr. Henry-Offor's statement in an email, "I think she wants them [her roommates] punished," arguing that "[t]his is not evidentiary proof that Ms. Eze made any such threats . . . ." (Id. at 9).

---

[26]The full reference on the Facebook page reads as follows: "Methane and ink, knives and pen, obvious and unknown, availability and passion. I need to declare 'Gotcha.'" (Eze Dep. at 182). Plaintiff explains that she likes to write poetry and this was about her need to choose between a career in medicine or creative writing. (Id. at 183). While there may be an innocent explanation to these words, it was not objectively unreasonable for someone unfamiliar with plaintiff's poetic interests to interpret this entry, with its reference to "knives" and "Gotcha" as troublesome, particularly when viewed in light of some of the other clearly odd statements that Ms. Eze had been making and particularly when her own mother, who presumably knew her better than the College officials, expressed concern that this was "FRIGHTENING."

She denies that she ever made any threats to her roommates or anyone else and that the defendants have not provided the "exact 'threats' verbatim that had allegedly been made by Ms. Eze."[27] (Id. at 10).

Even taking plaintiff's "innocent" account of events as true, this analysis is not relevant to the question of defendants' qualified immunity. Instead, the Court must consider whether it was reasonable for defendants to detain plaintiff based on the information known to them at the time. See Anderson v. Creighton, 483 U.S. at 640. While in hindsight, the officials' conclusions may be criticized because they and the reporting witnesses were mistaken as to plaintiff's mental state or drew erroneous inferences from her statements, the question is whether "every" reasonable official would conclude that defendants were violating plaintiff's rights by attempting to have her detained for evaluation based on this mistaken information. See Coollick v. Hughes, 699 F.3d at 221 (noting that "'[o]fficials are not liable for bad guesses in gray areas" but rather are "liable for transgressing bright lines'" (internal citations omitted)). Indeed, it is questionable whether a jury may even consider plaintiff's post hoc explanations when determining probable cause or qualified immunity, since the question depends on the evidence as seen by a reasonable official at the time of the detention, and without the benefit of hindsight.

Plaintiff also argues that defendants were not qualified to diagnose her. (Pl.'s Mem. at 12-13). She claims that because Dr. Henry-Offor was not a doctor of medicine, she was not a reliable source on which defendants could rely. (Id. at 9). Plaintiff also notes that because neither Dr. Munoz nor Scott is a psychiatrist, they could not properly make the diagnosis that she

---

[27]Plaintiff cites no authority for the proposition that defendants must provide the "verbatim" threats in order to prevail. Indeed, as noted, supra, the officials may rely on hearsay statements. (See discussion supra at 32-33).

was engaged in "'illogical thinking and paranoid delusions.'" (Id. at 10-11).

Plaintiff, however, fails to cite any support for her contention that only a licensed psychiatrist[28] could determine that plaintiff posed a danger to herself or others. Indeed, defendants do not claim that they relied on Dr. Henry-Offor as a medical doctor; rather, they relied on her opinion because she was someone familiar with plaintiff and had personally observed plaintiff's behavior. Second, Dr. Munoz is in fact a licensed psychologist and certified psychoanalyst. She and two other psychologists employed by the College – Dr. Robles and Dr. Puchkoff – considered Dr. Henry-Offor's emails and the concerns raised by plaintiff's mother that Ms. Eze might harm herself or her roommates, and concluded that plaintiff might be experiencing paranoid delusions and, if unable to judge reality, might be violent towards herself or others. (Munoz Decl. ¶¶ 4, 5).

In making the decision to detain plaintiff, defendants were relying on the appropriate legal standard set forth in Glass – namely, did plaintiff pose a threat of danger to herself or others. While plaintiff argues that the defendants' determination was in error, she has cited no support for that conclusion. Indeed, courts have held that the decision that a person is dangerous

---

[28]Although plaintiff asserts that Dr. Munoz was not a psychiatrist and therefore cannot properly make a diagnosis of need for psychiatric evaluation (Pl.'s Mem. at 11), plaintiff cites no authority to support her argument that only a licensed psychiatrist is capable of making the determination to transfer an individual to a hospital for evaluation. Indeed, in Anthony v. Wright, 339 F.3d 129 (2d Cir. 2003), cited by plaintiff in support of her claim, the police were found to have qualified immunity after they made the determination to transport the plaintiff to a hospital based on an anonymous 911 call and their own observations of plaintiff. Not only was there no psychiatrist present on the scene in Anthony, but here, three professionals with psychological training concluded that Ms. Eze's actions and statements raised the concern that she posed a danger to herself or others. If three professional psychologists are incapable of making a determination that someone poses a danger to themselves or others, how could the police possibly make such a determination?

and requires further evaluation "turns on the meaning of the facts which [typically] must be interpreted by expert psychiatrists and psychologists." Olivier v. Robert L. Yeager Mental Health Center, 398 F.3d 183, 190-91 (2d Cir. 2005) (alteration in original) (emphasis added) (quoting Addington v. Texas, 441 U.S.418, 430 (1979)) (internal quotation marks omitted). Courts have recognized that expert opinions are necessary for this determination. Id.; see also Mittelman v. County of Rockland, 2013 WL 1248623, at *25, 29-30 (citing involuntary commitment cases where courts have granted summary judgment in favor of defendants because plaintiff failed to establish that defendants' decision "fell substantially below medical standards," and holding that plaintiff's suicidal and homicidal threats "provided ample legal and medical grounds" for defendants believing plaintiff required psychiatric evaluation as a matter of law). Despite the fact that this case has been pending since May 20, 2011, plaintiff has not presented any expert opinion or other admissible evidence to support her contention that the officials' decision fell below medical standards or was unreasonable and without factual basis.[29]

Plaintiff asserts that Dr. Munoz's 15 to 20 minute interview questioning Ms. Eze was not enough time for Dr. Munoz to make a formal assessment of dangerousness based on Ms. Eze's mental condition. (Pl.'s Mem. at 12-13). Again, plaintiff makes this assertion without any supporting evidence or authority to suggest that this would not be sufficient time to make an initial evaluation. Indeed, by plaintiff's own admission, Dr. Munoz asked plaintiff questions which related to her psychological state of mind. (See Compl. ¶ 27).

Plaintiff further argues that defendants' interpretation of her behavior was incorrect given

---

[29]Discovery in this case is now closed, and plaintiff failed to request leave to obtain an expert for the summary judgment motion.

her "calm, polite, rational, and coherent" demeanor. (Pl.'s Mem. at 8). She claims that at the meeting with the school administrators, she denied hearing voices or seeing things and denied being suicidal. (Id. at 9). However, plaintiff's only evidence that she was calm is her own denial. She has produced no independent witnesses to show that she was rational or coherent at the meeting. More importantly, even assuming that her behavior was calm, plaintiff has not presented any authority suggesting that defendants' evaluation that plaintiff was experiencing a "thought disorder with paranoid delusions that affected [plaintiff's] ability to judge what was real" (Munoz Decl. ¶ 5; Defs.' 56.1 Stmnt ¶ 20), is necessarily contradicted by the fact that she may have presented calmly and rationally at that moment. Plaintiff's argument ignores the fact that Dr. Munoz's assessment of plaintiff's psychological state was not based solely on the interview, but also took into account the totality of the circumstances, including the events leading up to the interview.

In summary, the undisputed evidence demonstrates that defendants' concerns regarding Ms. Eze's safety and the safety of others took into account all the information conveyed by others regarding her increasingly worrisome behavior and statements over a period of less than a week, as well as their own observations of plaintiff. To the extent that plaintiff argues that the defendants cannot claim that their conduct was objectively reasonable because they did not act immediately to have Ms. Eze hospitalized when they first received the first email from Dr. Henry-Offor, this argument ignores the fact that the emails continued with increasing frequency and at an elevated level of concern over the period of time from November 24 through December 2, with Dr. Henry-Offor sending several emails on December 2. In fact, Dr. Munoz did not even learn of the emails until December 2, by which time, events had escalated and the concerns were

based on several days of accumulated evidence and reports. Given that all prior efforts to persuade Ms. Eze to voluntarily seek counseling on her own had failed, defendants' choice was to do nothing in the face of a perceived risk of harm or to detain her for a psychiatric evaluation.

Indeed, defendants' choice to detain plaintiff for evaluation was reasonable in light of the alternatives. Officials at the College had previously suggested that plaintiff seek counseling, but she had "refused previous referrals to the counseling center." (Munoz Decl., Ex. A at 20). While Dr. Henry-Offor had said that she would find Ms. Eze and bring her for an evaluation, Dr. Henry-Offor did not know where Ms. Eze was living at the time following her departure from her apartment. (Id. at 25). Although the officials could arguably have decided to expel Ms. Eze from the College, not only does there seem to be no basis on which to justify such an action when dealing with a disturbed student, but such a decision could have potentially exacerbated her mental state.[30] Moreover, expulsion from the school would not have prevented Ms. Eze from taking action to harm herself or others. Furthermore, banning her from campus – even if physically possible – would similarly not have provided a safe outcome. A ban would not have solved the initial threat, which was defendants' evaluation that Ms. Eze had the potential for violence towards her roommates or could hurt herself. Dr. Robles first considered a less intrusive alternative, calling Kings County Hospital's Mobile Crisis Unit to perform an initial evaluation, but as events escalated, it was determined that calling 911 was more appropriate. (Munoz Decl., Ex. A at 20, 23). As Dr. Robles had noted in her email, the Mobile Crisis Unit was an appropriate response as long as it was determined that Ms. Eze did not pose an "imminent

---

[30]In fact, Dr. Henry-Offor wrote that she was worried about plaintiff's mental state, but "did not confront her because [she did] not want to cause her undue stress." (Munoz Decl., Ex. A at 25).

danger," or was not at "imminent risk of hurting someone else," at which point calling 911 was the appropriate response. When Dr. Henry-Offor approached the police, the detective suggested that she approach College officials about obtaining a psychiatric evaluation for plaintiff, so it was not unreasonable for the defendants to seek help from experts outside the College community. As defendants understood the circumstances at the time, without the benefit of plaintiff's post hoc explanation of her behavior, it was not unreasonable for them to believe that they needed to detain plaintiff to ensure that she did not harm herself or others in the community.

Moreover, although defendants Munoz and Scott are the two individual defendants remaining in this case, it is important to note that the decision to detain Ms. Eze was actually made by several other people at the College. On December 1, Dr. Robles first recommended that Ms. Eze be evaluated by Kings County Hospital's Mobile Crisis Unit. (Munoz Decl., Ex. A at 23). On December 2, Dr. Robles noted that Ms. Eze had previously refused counseling and had a pattern of illogical writing, threats against certain people, and paranoia, as well as extreme concern from Mary Eze. (Id. at 20). As events continued to escalate, the College administrators, Dr. SenGupta and Dr. Robles, in consultation with Dr. Puchkoff, another psychologist, and the College's lawyer, decided that Eze's worrisome behavior required her to be transported to Kings County Hospital. (Id. at 20-21). Although plaintiff has named Dr. Munoz and Scott as the individual defendants responsible for her detention, the objective evidence fails to demonstrate that they were actually the ones responsible for the decision to detain her. The evidence shows that both Scott and Dr. Munoz were working in conjunction with several colleagues at the College, and taking direction from their direct supervisors.

Although plaintiff argues that defendants' interpretation of events or of the statements in

the emails was not reasonable, plaintiff has failed to controvert any of the material facts that led the defendants to conclude that she posed a danger to herself or others. While officials of "reasonable competence" may disagree in their interpretation of the words that plaintiff wanted to "take care of" or "punish" her roommates, and they might discount the pleas of a distraught mother that "I hope she will not harm herself," three mental health professionals, trained to interpret psychological problems, concluded, based on all the other seemingly paranoid and disturbing information conveyed to them, that plaintiff posed a potential danger to herself or others. In opposing defendants' motion on qualified immunity, plaintiff has provided no basis for demonstrating that "every" reasonable psychologist or college official would agree that plaintiff's ambiguous statements were in fact innocent, and not threats of violence. Coollick v. Hughes, 699 F.3d at 220

In an age where college administrators are keenly aware of their responsibility to protect their students from potentially dangerous conduct, defendants and the other administrators at the College carefully considered the information available to them at the time and made the reasonable conclusion that a professional should evaluate Ms. Eze to potentially protect her from herself, as well as to protect her former roommates. Even accepting plaintiff's explanations as true, given everything Dr. Munoz and Scott knew at the time from Dr. Henry-Offor and the directions given by their supervisors and colleagues at the College, their actions were objectively reasonable. Plaintiff has failed to establish a material issue of fact with respect to defendants' qualified immunity defense. See Taravella v. Town of Wolcott, 599 F.3d at 134-35.

Accordingly, the Court finds that the defendants had an objectively reasonable basis to believe that Ms. Eze posed a potential danger to herself or others such that detention for purposes

of a psychiatric evaluation was warranted. The Court respectfully recommends that summary judgment on the remaining claims against defendants Scott and Munoz be granted on the grounds that the defendants are subject to qualified immunity for their actions.[31]

## CONCLUSION

Accordingly, the Court respectfully recommends that the district court grant defendants' motion for summary judgment based on the defense of qualified immunity.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R Civ. P. 6(a), 6(e), 72(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989). The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.
Dated: Brooklyn, New York
March 13, 2014

/s/ CHERYL POLLAK

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

---

[31]Since the Court concludes that defendants have established a viable defense of qualified immunity, the Court has not separately addressed the issue of probable cause.

42