UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SOPHIA CHINEMEREM IHUOMA EZE,

                Plaintiff,  **MEMORANDUM & ORDER**
  11-CV-2454 (MKB)

      v.

ROBERT SCOTT and MICHELE MUNOZ,

                Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff commenced this action against Defendants the City University of New York at Brooklyn College ("Brooklyn College"), Brooklyn College Campus and Community Safety Services, Donald Wenz, Harry Gomez, Cynthia Hunter, Robert Scott, Jaimie Weiss, Michele Munoz, Milga Morales, John Doe security officers 1–4, and Jane Doe security officers 1–4, pursuant to 42 U.S.C. § 1983 and state law alleging violations of her rights arising from her detention at BCCCSS's office and her subsequent involuntary confinement at a psychiatric hospital. (Docket Entry No. 1.) Plaintiff filed an Amended Complaint on September 9, 2011. On October 18, 2011, Defendants moved to dismiss this action in its entirety. (Docket Entry No. 22.) On December 27, 2011, the Honorable Judge John Gleeson denied Defendants' motion as to Plaintiff's § 1983 claim against Scott and Munoz[1] arising from her detention and

---

[1] Plaintiff named a Sally Robles, then Acting Director of the Brooklyn College Personal Counseling Center (the "Counseling Center"), in her Amended Complaint. The parties have since stipulated that any references in the Amended Complaint to Robles actually refer to Michele Munoz who was the psychologist who met with Plaintiff on the day of the incident. (Docket Entry No. 39.)

transportation to the hospital but granted the motion in all other respects.[2] *Eze v. City Univ. of New York at Brooklyn Coll.*, No. 11-CV-2454, 2011 WL 6780652 (E.D.N.Y. Dec. 27, 2011). On August 22, 2013, Scott and Munoz moved for summary judgment. (Docket Entry No. 65.) On October 9, 2013, the Court referred the motion to the Honorable Cheryl L. Pollak for a report and recommendation. On March 13, 2014, Judge Pollak filed a report and recommendation ("R&R") recommending that the Court grant Defendant's motion for summary judgment based on qualified immunity. (Docket Entry No. 81.) Plaintiff filed objections on March 27, 2014. (Docket Entry No. 83.) For the reasons discussed below, the Court declines to adopt the R&R and denies Defendants' motion for summary judgment.

**I. Background**

Plaintiff was a student at Macaulay Honors College at Brooklyn College, a senior college of the City University of New York, from the fall of 2007 through the fall of 2008. (Defs. 56.1 ¶¶ 1–2; Pl. 56.1 ¶ 1.)[3] In December 2008, Scott was employed at Brooklyn College as Coordinator of the Honors Academy, a unit that houses several honors programs including Macaulay Honors College. (Defs. 56.1 ¶ 3; Pl. 56.1 ¶ 2.)[4] Munoz is a licensed psychologist and

---

[2] The action was transferred to this Court from Judge Gleeson on March 27, 2012.

[3] References to "Pl. 56.1" refer to Plaintiff's Amended Local Civil Rule 56.1 Statement filed on August 26, 2013. (Docket Entry No. 79.)

[4] Plaintiff "[d]enies knowledge and information sufficient to form a belief as to the truth or falisity of the statements" in paragraphs 3–7, 15–21 and 25–28. (Pl. 56.1 ¶ 2.) Plaintiff does not provide any evidence to contradict Defendants' statements. "Generally, a plaintiff['s] failure to respond or contest the facts set forth by the defendant[] in [its] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Young v. Nassau Univ. Med. Ctr.*, No. 10-CV-00649, 2011 WL 6748500, at *1 n.2 (E.D.N.Y. Dec. 22, 2011) (internal quotation marks omitted) (quoting *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Liang v.*

certified psychoanalyst, and she has been a part-time employee at Brooklyn College since January 2006. (Defs. 56.1 ¶¶ 4–5; Pl. 56.1 ¶ 2.)

Between November 24, 2008 and December 2, 2008, Scott and other officials at Brooklyn College received emails from a friend of Plaintiff's family, Brenda Henry-Offor, which expressed concerns about the state of Plaintiff's mental health and requested assistance. (Defs. 56.1 ¶¶ 6–8; Pl. 56.1 ¶¶ 1–2.)

On November 24, 2008, Henry-Offor forwarded an email to Scott and Dr. Gunja SenGupta, Director of the Macaulay Honors College, that Henry-Offor had received from Plaintiff's mother Mary Eze. (Defs. 56.1 ¶ 9; Pl. 56.1 ¶ 3.) Plaintiff's mother expressed concern about "FRIGHTENING UNCO[O]RDINATED REMARKS" that Plaintiff had posted on Facebook and stated that she feared that Plaintiff might harm herself. (Defs. 56.1 ¶ 9; Pl. 56.1 ¶ 3; Nov. 24, 2008 Email, annexed to Scott Decl. as Ex. A.) Plaintiff denies that this email included a plea for Henry-Offor to take action. (Pl. 56.1 ¶ 9.) In the November 24, 2008 email, Mary Eze stated, *inter alia*, "Pls [sic] something has to be done fast[.] Is she on therapy already? Are there any medications? Pls [sic] we are scared she is alone Night [sic] can be very bad." (Nov. 24, 2008 Email.)

On November 29, 2008, Henry-Offor wrote Scott and SenGupta expressing her own concern about Plaintiff's mental state based on statements Plaintiff made to Henry-Offor. (Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 1.) Henry-Offor stated that Plaintiff informed her, *inter alia*, that friends were taping their conversations with Plaintiff, Plaintiff wanted to hire a private detective to find a

---

*Café Spice SB, Inc.*, No. 09-CV-1306, 2012 WL 5988766, at *1 n.1 (E.D.N.Y. Nov. 29, 2012) (quoting *Holtz*, 258 F.3d at 73). The Court will only deem admitted those facts in Defendants' Local Rule 56.1 Statement that are supported by admissible evidence in the record. *See Liang*, 2012 WL 5988766, at *1 n.1; *Battle v. Day Care Council*, No. 11-CV-4043, 2012 WL 3055574, at *1 n.1 (S.D.N.Y. July 26, 2012).

3

blog her former roommates kept putting up and taking down and Plaintiff's landlord installed a monitoring system in Plaintiff's room so that men upstairs could see her. (Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 1.) Henry-Offor also stated that she had called New York City's 311 service and was advised that "Brooklyn College should call for ambulance service for [Plaintiff] and have them take her to the Emergency Room for evaluation and help." (Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 1.)

On December 1, 2008, Henry-Offor emailed Scott and SenGupta reporting that Plaintiff calls her "constantly to report that there are two guys above her who spy on her and makes jokes about her." (Defs. 56.1 ¶ 12; Pl. 56.1 ¶ 1.)

On December 2, 2008, at 9:49 a.m., Henry-Offor emailed Scott, SenGupta, Sally Robles, Acting Director of the Brooklyn College Personal Counseling Center (the "Counseling Center"), and Jacqueline Williams, Assistant Dean of Student Affairs, stating that she had spoken with Plaintiff the night before about Plaintiff's former roommates and that she believed that Plaintiff wanted the "two young women punished." (Defs. 56.1 ¶ 13; Pl. 56.1 ¶ 1.) At 10:44 a.m., Henry-Offor emailed the same parties and expressed that she hoped someone at Brooklyn College could "help with escorting [Plaintiff] and getting the information to health professionals." (Defs. 56.1 ¶ 14; Pl. 56.1 ¶ 1.) Later that day, Robles wrote to Morales, Dean of Student Affairs, recommending that Plaintiff be transported to the hospital for a psychiatric evaluation. (Defs. 56.1 ¶ 15; Pl. 56.1 ¶ 2.) After receiving Robles's email, Morales initiated a telephone conference with Scott, Ursula Chase, Deputy Director of the Department of Campus and Community Safety Services ("Campus Security"), and Pamela Pollack, an attorney employed at Brooklyn College. (Defs. 56.1 ¶ 16; Pl. 56.1 ¶ 2.) During the telephone conference, Morales and Chase discussed the need to have Plaintiff seen by staff in the Counseling Center or sent for a psychiatric evaluation. (Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 2.) During the afternoon, Munoz, Robles and another

4

psychologist of the Counseling Center concluded that Plaintiff may be experiencing a thought disorder and paranoid delusions and that Plaintiff should be evaluated promptly by a psychiatrist given the potential for harm to herself or to others. (Defs. 56.1 ¶¶ 19–20; Pl. 56.1 ¶ 2.)

At approximately 3:40 p.m. on December 2, 2008, Plaintiff went Campus Security to file an incident report. (Defs. 56.1 ¶ 22; Pl. 56.1 ¶ 1.) Plaintiff reported that she sometimes heard people talking about her actions inside her room, that her former roommates were posting defamatory blogs about her, and that people were listening to her cellular telephone conversations.[5] (Defs. 56.1 ¶ 24; Pl. 56.1 ¶ 1.) Chase was notified that Plaintiff was present in Campus Security. (Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 2.) Chase called Munoz who then advised Chase to keep Plaintiff "engaged" and to call Scott so he could secure Plaintiff's cooperation in going to the hospital. (Defs. 56.1 ¶ 27; Pl. 56.1 ¶ 2.)

The Campus Security public safety officer taking Plaintiff's incident report took Plaintiff to Chase's office where they were shortly joined by Scott and Munoz. (Defs. 56.1 ¶¶ 29–31; Pl. 56.1 ¶ 1.) According to Plaintiff, she responded in the negative to a series of questions from Munoz concerning whether Plaintiff contemplated suicide, heard voices, or saw "things." (Pl. 56.1 ¶ 10–11; Eze Aff. ¶ 6.) Plaintiff asked Munoz if Plaintiff could leave the room but Munoz refused her request and kept asking Plaintiff personal questions. (Pl. 56.1 ¶ 12; Eze Aff. ¶ 6.) Plaintiff also requested that she be permitted to withdraw from Brooklyn College. (Pl. 56.1 ¶ 13.) Munoz and Scott did not permit Plaintiff to leave or withdraw. (*Id.* ¶ 14.) Plaintiff then informed Munoz that she wanted to leave in order to attend a group presentation in Manhattan

---

[5] Although Plaintiff admits this statement, her affidavit only states that she went to Campus Security to report that she found a hidden camera in the ceiling vent of her room and that she suspected her former roommates of making defamatory comments about her on the internet. (Affidavit of Sophia Chinemerem Ihuoma Eze ("Eze Aff.") ¶¶ 4–5.)

5

that she did not want to miss. (Eze Aff. ¶ 7.) Munoz responded that she was not going anywhere and she was getting an ambulance. (*Id.*) Plaintiff also testified during her deposition that she could not leave because Scott, the safety officer, and the head of security, were standing in the doorway, blocking her exit. (*Id.* ¶ 6.)

Approximately fifteen minutes later, a security officer knocked on the door and stated that the ambulance had arrived. (Defs. 56.1 ¶ 34; Pl. 56.1 ¶ 1; Eze Aff. ¶ 22.) Plaintiff testified that Scott, Munoz, Chase and two female public safety officers surrounded Plaintiff and led her to the ambulance, which took her to Kings County Hospital Center (the "Hospital"). (Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 1.) Plaintiff did not consent to being taken by Defendants to the Hospital. (Pl. 56.1 ¶ 16.) Plaintiff contends that Scott rode with Plaintiff in the ambulance but he did not speak to her. (Defs. 56.1 ¶ 36; Pl. 56.1 ¶¶ 1, 19.) Plaintiff was admitted as a patient in the psychiatric unit and remained there until her discharge on December 19, 2008. (Defs. 56.1 ¶ 37; Pl. 56.1 ¶ 1.) According to Defendants, Plaintiff submitted an application for voluntary admission to the Hospital. (Defs. 56.1 ¶ 38.) According to Plaintiff, notwithstanding the signed form, Plaintiff denies that her commitment to the Hospital was voluntary. (Pl. 56.1 ¶¶ 4, 21.) Plaintiff was told by a Hospital employee that she would be able to leave whenever she wanted to leave if she signed the form. (*Id.* ¶ 22.)

## II. Discussion

### a. Standard of Review

#### i. Report and Recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which

the party objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson*, No. 10-CV-1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. 28 U.S.C. § 636(b)(1)(C); *see also Larocco*, 2010 WL 5068006, at *2. The clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments. *See Rahman v. Fischer*, No. 10-CV-1496, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014) ("If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error." (citations omitted)); *Time Square Foods Imports LLC v. Philbin*, No. 12-CV-9101, 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (clearly erroneous standard applies when party reiterates arguments made to the magistrate judge); *see also DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

### ii. Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

7

(1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Plaintiff's objections

Plaintiff argued that there was no probable cause for Defendants to detain her prior to her transport to the Hospital and that this detention resulted in a violation of her Fourth Amendment rights. Defendants argue that they believed Plaintiff posed a danger to herself and to others and therefore had a reasonable basis to force her transport to the Hospital.

Judge Pollak recommended that the Defendants' motion for summary judgment be granted based on qualified immunity. (R&R 42.) Judge Pollak found that it was reasonable for Defendants to consider Henry-Offor's emails and to rely on the statements therein in analyzing Plaintiff's mental state, (*id.* at 33), and that based on the information known to Defendants at the time of Plaintiff's detainment, it was reasonable for them to conclude that Plaintiff posed a threat to herself or others such that an involuntary psychiatric evaluation was necessary, (*id.* at 35–39). Plaintiff now argues that Judge Pollak "overlooked the material issues of fact raised by Plaintiff in her opposition to Defendants' motion." (Pl. Obj. 3.) Namely, Plaintiff argues that she has no history of violence, posed no danger to herself or others, and her demeanor was "calm, polite, rational, coherent" while being "interrogated" and forcibly transported to the Hospital by Defendants. (*Id.* at 4.) Plaintiff argues that her deposition and affidavit testimony create a

8

material factual dispute as to the existence of probable cause such that the matter must be decided by a jury. (*Id.* at 5.)

For the reasons discussed below, the Court agrees with Plaintiff and finds that Plaintiff has established a genuine dispute as to material facts sufficient to overcome Defendants' motion for summary judgment.

### c. Fourth Amendment — Qualified Immunity

"The defendants are entitled to qualified immunity if they can establish either that (1) 'a constitutional right was [not] violated' or (2) 'the right was [not] clearly established.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, --- F.3d ---, ---, 2014 WL 1042164, at *4 (2d Cir. Mar. 19, 2014) (alterations in original) (quoting *Bailey v. Pataki*, 708 F.3d 391, 404 (2d Cir. 2013)); *see also Negron v. City of New York*, No. 09-CV-0944, 2013 WL 5525692, at *4 (E.D.N.Y. Oct. 4, 2013) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))); *Dowling v. City of New York*, No. 11-CV-4954, 2013 WL 5502867, at *7 (E.D.N.Y. Sept. 30, 2013) (noting that qualified immunity protects officials performing discretionary functions from liability for civil damages so long as their conduct does not violate a clearly established right (citing *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010))). To determine whether qualified immunity attaches, the Court must determine "whether it was 'objectively reasonable' for the [state actor] to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravella*, 599 F.3d at 133–34). An action is objectively reasonable "if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Southerland v.*

9

*City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (applying this principle to a New York City Administration of Children's Services caseworker (quoting *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010))); *Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) (applying the principle to the New York City Fire Department Lieutenant); *Vallen v. Connelly*, 185 F. App'x 22, 23 (2d Cir. 2006) (applying the principle to social workers who had the plaintiff involuntarily committed); *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999) (applying same principle to an employee of the New York City Child Welfare Administration); *but see Bolmer v. Oliveira*, 594 F.3d 134, 145 (2d Cir. 2010) (not addressing "objective reasonableness" in the context of a doctor's qualified immunity defense for involuntarily committing the plaintiff). "[T]hough mistaken judgments reasonably arrived at are protected, qualified immunity does not protect an official against redress for performance that was plainly incompetent." *Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir. 1995).

Here, there is no dispute that Plaintiff had a constitutional right to be free from unreasonable seizure unless she posed a threat to herself or others. *See Green*, 465 F.3d at 83 ("We hold that it was clearly established at the time of the incident under review that a competent adult could not be seized and transported for treatment unless she presented a danger to herself or others."); *Esposito v. Quatinez*, No. 09-CV-0421, 2014 WL 842766, at *8 (E.D.N.Y. Mar. 5, 2014) ("[T]he Supreme Court made clear . . . that mentally ill individuals have a right to be free from bodily restraint except in situations where professional judgment deems restraint necessary to assure the patient's safety or the safety of others."); *see also Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) ("[T]he Fourth Amendment applies to involuntary commitment."); *cf. Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) ("As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to

herself or to others." (citation and internal quotation marks omitted)). Nor is there a dispute that Plaintiff was "seized." (Defs. Mem. 9 (assuming seizure for purposes of this motion).) The Court must then decide whether it was "objectively reasonable" for Defendants to seize Plaintiff in Chase's office and subsequently cause her to be involuntarily transported to the Hospital. "Thus, the availability of qualified immunity turns on whether it was objectively reasonable for the [D]efendants to believe, at the time they examined [Plaintiff] and in light of the information that they possessed, that [Plaintiff] was dangerous." *Glass*, 984 F.2d at 57; *Moffett v. Town of Poughkeepsie*, No. 11-CV-6243, 2012 WL 3740724, at *9 (S.D.N.Y. Aug. 29, 2012) ("Probable cause is also assessed objectively when the seizure occurs for purposes of a psychiatric evaluation, and courts must consider the perspective of a reasonable person in the position of the seizing official, in light of all known facts and circumstances." (citing *Green*, 465 F.3d at 83)).

Here, Plaintiff does not dispute the vast majority of Defendants' factual allegations, including their receipt of several emails from Henry-Offor expressing concern about Plaintiff's mental health.[6] The Court finds that these emails provided Defendants with sufficient reason to

---

[6] Plaintiff argues that Judge Pollak erred in relying on hearsay, in the form of emails from Henry-Offor, when assessing the reasonableness of Defendants' actions. (Pl. Obj. 5–6.) Plaintiff takes issue with Judge Pollak's use of Scott's personal observations of Plaintiff's behavior as corroboration for any suggestion of Plaintiff's dangerousness within Henry-Offor's emails. (*Id.*) Scott questioned Plaintiff's "grasp on reality" after she started accusing her roommates of posting defamatory things about her on the internet which neither Scott nor Plaintiff could locate. (Scott Decl. ¶ 4.) The corroborative value of Scott's personal observation is limited. In today's hyper-cyber world, a report of internet defamation seems more commonplace than "odd" as to be indicative of a loose "grasp on reality." However, as Judge Pollak made clear, it was reasonable for Defendants to rely on Henry-Offor's emails as Scott had known Henry-Offor for more than ten years and understood that she was either related by marriage to Plaintiff or a close family friend. (*Id.* ¶ 5; R&R 33.) *Cf. Sanseverino v. Chrostowski*, 536 F. App'x 62, 64–65 (2d Cir. 2013) ("As the Supreme Court has explained, probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts, and often requires consideration of the veracity and basis of knowledge of persons supplying hearsay information." (internal quotation marks omitted) (quoting *Illinois v.*

meet with Plaintiff.  Consequently, it was arguably reasonable for Chase to require Plaintiff to go to her office.  However, material issues of fact prevent the Court from determining that Defendants' subsequent actions were objectively reasonable.  According to Plaintiff, once inside Chase's office, Plaintiff told Munoz that she was not suicidal, did not hear voices and did not see "things."  Despite Plaintiff's answers (suggesting that she was not suffering a thought disorder) Defendants denied Plaintiff's request to leave Chase's office.  It is also significant that only approximately fifteen minutes passed before an ambulance arrived.  Drawing an inference in favor of Plaintiff, Defendants called for the ambulance, at the latest, after only approximately ten minutes of face-to-face discussion.[7]  Drawing an inference in favor of Plaintiff, the "interrogation" that took place in Chase's office dispelled any concern that Plaintiff presented a

---

*Gates*, 462 U.S. 213, 232 (1983))).  Under the "totality of the circumstances" it was reasonable for Defendants to rely on Henry-Offor's emails.  *Cf. United States v. Cardona*, 545 F. App'x 76, 78 (2d Cir. 2013), *as amended* (Dec. 3, 2013) ("Probable cause to arrest may be based in whole or in part upon information obtained through the use of an informant, in which case the court must assess the information by examining the totality of the circumstances bearing upon its reliability." (citation and internal quotation marks omitted)).

[7] The Court draws this inference because the parties have not made clear when emergency services were called.  Munoz's sworn statement suggests that emergency services were called immediately upon Plaintiff's arrival at Campus Security.  (Munoz Decl. ¶ 7 ("I received a call from Ursula Chase in public safety informing me that [Plaintiff] had come to their offices . . . .  I advised her to call emergency services.").)  Munoz's statement actually supports a finding that such an immediate call to emergency services was *not* reasonable as, according to Munoz, she, along with Robles and Puchkoff, had decided earlier that day to persuade Plaintiff to go to the counseling center and only if Plaintiff refused to do so would emergency services be called.  (*Id.* ¶ 6; *see also* Chase Decl. ¶ 4 ("[W]e discussed the need to have [Plaintiff] seen by the college's Personal Counseling Center or possibly sent to a hospital for psychiatric evaluation.").)  Furthermore, an email from SenGupta, to Scott, Robles, Williams and Henry-Offor seem to suggest that there was a plan to have Plaintiff seen by the Counseling Center rather than emergency services.  (SenGupta Email dated Dec. 2, 2008 11:15 a.m. ("I am copying Jaime Weiss on this message. . . .  [he is] most likely to be the one to escort [Plaintiff] to the Counseling Center . . . .  Once we have an idea of when we can take her over to Counseling, we will call the Center."), annexed to Chase Decl. as Ex. A.)

12

threat to herself or to others.[8]  Accordingly, a reasonable jury could find that there was not a probable or substantial chance that Plaintiff would harm herself or others.  *See Hoffman v. Cnty. of Delaware*, 41 F. Supp. 2d 195, 209 (N.D.N.Y. 1999) ("[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." (quoting N.Y. Mental Hyg. Law § 9.01)), *aff'd*, 205 F.3d 1323 (2d Cir. 2000).  Furthermore, although there is some evidence in the record that Plaintiff rebuffed suggestions that she visit the Counseling Center in the past, there is no evidence that, on the date in question, Defendants asked Plaintiff to see a counselor rather than immediately calling for an ambulance and involuntarily transporting Plaintiff to the Hospital.[9]

Judge Pollak noted that Plaintiff "produced no independent witnesses to show that she was rational or coherent at the meeting."  (R&R 38.)  Although true, Plaintiff's own sworn statements are sufficient to create a genuine dispute as to the material fact leading up to Plaintiff's seizure and Defendants' decision to call an ambulance.  *Cf. Brown v. Eli Lilly & Co.*,

---

[8] Scott "does not recall much about [the] exchange" and does not discuss his impressions of Plaintiff's demeanor.  (Scott Decl. ¶ 10.)  Similarly, Munoz does not discuss her impressions of Plaintiff's demeanor.  (*See generally* Munoz Decl.)  Chase only states that Plaintiff walked "calmly" to the ambulance after speaking with Scott and Munoz.  (Chase Decl. ¶ 9.)

[9] Judge Pollak found that although the "less intrusive alternative" of calling the Hospital's mobile crisis unit was initially considered by Robles, "as events escalated, it was determined that calling 911 was more appropriate."  (R&R 39.)  The only escalation the Court is able to decipher from the record is that Robles discovered that Plaintiff had previously declined referrals to the Counseling Center.  (Robles Email dated Dec. 2, 2008 2:10 p.m., annexed to Munoz Decl. as Ex. A.)  It is unclear why Plaintiff's previous refusals to visit the Counseling Center would prompt Defendants to call 911 instead of asking Plaintiff again, in light of Defendants' newly-founded concerns, that she visit the Counseling Center or, in the alternative, call the Hospital's mobile crisis unit.  Less intrusive alternatives were indeed available and rejected without explanation from Defendants.  *Cf. Sumay v. City of New York Health & Hosp. Corp.*, No. 97-CV-3606, 1998 WL 205345, at *6 (S.D.N.Y. Apr. 28, 1998) (Sotomayor, J.) (finding hospital personnel protected by qualified immunity for the involuntary commitment of the plaintiff based, in part, on a previous evaluation by the hospital's mobile crisis unit).

654 F.3d 347, 358 (2d Cir. 2011) ("Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(a))); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (noting that it will be the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," that would allow a court to make "some assessment of the plaintiff's account"); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."). Judge Pollak then found that even assuming that Plaintiff was calm in Chase's office, Plaintiff did not present any authority that suggesting that a calm presentation "necessarily contradict[s]" Defendants' prior conclusion that Plaintiff was experiencing a thought disorder with paranoid delusions.[10] (R&R 38.) However, drawing the appropriate inference, Plaintiff's calm demeanor and negation of suicidal thoughts and delusions did contradict Defendants' prior conclusions as to her mental state and as to the danger to herself and others.[11] Based on the foregoing, the Court concludes

---

[10] The Court notes that Munoz, Robles and Puchkoff only decided that Plaintiff "*may* be experiencing a thought disorder," a decision they arrived at based solely on Henry-Offor's emails. (Defs. 56.1 ¶¶ 19–20; Pl. 56.1 ¶ 2; Munoz ¶ 5 ("[Plaintiff]'s reported statements and behavior indicated that she *might* be experiencing a thought disorder with paranoid delusions . . . ." (emphasis added)).) Prior to December 2, 2008, Munoz had no contact with Plaintiff. (Munoz Decl. ¶ 3.)

[11] Judge Pollak cited and relied on caselaw concerning alleged violations of substantive due process based on involuntary commitment pursuant to New York Mental Hygiene Law § 9.27. (R&R 30–31.) These cases evaluate the reasonableness of medical personnel's decisions according to established medical standards because "a doctor's decision to commit someone involuntarily under the Mental Hygiene Law 'does not ordinarily involve matters within the

14

that a reasonable jury *could* find that no reasonable official would have believed that Plaintiff presented a probable or substantially possible danger to herself or others.[12] *Cf. Vallen*, 185 F. App'x at 23 (holding that the defendants social workers' actions were objectively reasonable in bringing about plaintiff's involuntary commitment based on plaintiff's past history of homicide, reported threatening behavior toward relatives, long history of on-and-off involuntary commitment and an anonymous tip that plaintiff was armed and planned to resist an attempt to

---

layman's realm of knowledge.'" *Mittelman v. Cnty. of Rockland*, No. 07-CV-6382, 2013 WL 1248623, at *24–25 (S.D.N.Y. Mar. 26, 2013) (quoting *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 189 (2d Cir. 2005) and *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)); *see also Fisk v. Letterman*, 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007) ("The Mental Hygiene Law implicitly defers to medical judgment, and requires physicians 'to make a medical decision, guided by standards that are generally accepted within the medical community.'" (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1062–63 (2d Cir. 1995))). It is not clear to the Court that Defendants' actions should be assessed according to generally accepted "medical standards" as Defendants were not treating Plaintiff nor were they acting as medical personnel and admitting Plaintiff for involuntary treatment pursuant to New York Mental Hygiene Law § 9.27. Instead, under the Fourth Amendment, the standard is "only if there are reasonable grounds for believing that the person seized is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (citation and internal quotation marks omitted) (addressing qualified immunity of police officers ); *see also Bender v. Lowe*, No. 08-CV-0334, 2011 WL 4001147, at *13–14 (S.D.N.Y. Aug. 31, 2011) ("Courts in this circuit have held that an involuntary commitment does not constitute a violation of the Fourth Amendment so long as the defendants were objectively reasonable in believing that the person was a danger to herself or others. The Fourth Amendment requires a showing that dangerous behavior was probable or substantially possible, not an actual showing that dangerous behavior occurred."), *aff'd*, 531 F. App'x 142 (2d Cir. 2013).

[12] Judge Pollack did not address probable cause as she found that Defendants had "arguable" probable cause and therefore were protected by qualified immunity. (R&R 42 n.31.) The doctrine of qualified immunity presupposes a constitutional violation. *See Mittelman*, 2013 WL 1248623, at *16 ("Because none of [plaintiff]'s claims against either of the individually named defendants is viable as a matter of law, there is no need to discuss qualified immunity — a doctrine that presupposes a constitutional violation but excuses it on the ground that no reasonable police officer in the defendant's situation would have apprehended that he was violating the plaintiff's constitutional rights."). The Court's finding that Defendants are not entitled to qualified immunity at this time precludes a finding that, as a matter of law, they had probable cause to detain and transport Plaintiff. *See Wood v. The Town of E. Hampton*, No. 08-CV-4197, 2014 WL 60087, at *14–15 (E.D.N.Y. Jan. 7, 2014) (holding that the same "genuine issues of material fact that preclude[d] an award of summary judgment dismissing Plaintiff's false arrest claim likewise preclude granting . . . qualified immunity").

15

recommit him); *Anthony*, 339 F.3d at 137–138 (finding that officers were entitled to qualified immunity for involuntary hospitalization of Plaintiff because, although Plaintiff was "calm[] and quiet[]," Plaintiff was "uncommunicative" and the officers were responding to a 911 call from a woman who claimed to be "at risk of immediate physical injury"); *Glass*, 984 F.2d at 57–58 (affirming the lower court's finding of qualified immunity to the defendants based on two reports that plaintiff had threatened an individual with a gun, plaintiff's "extensive psychiatric history, which included a history of violent behavior" and plaintiff's "hostile, guarded, angry, suspicious, uncooperative, and paranoid" demeanor); *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 549 (E.D.N.Y. 2013) (finding social workers' removal of a child from mother's care objectively reasonable given hospital records of mother's history of panic while with her child, evidence that the mother slept heavily due to medications and plaintiff's history of psychiatric instability), *aff'd*, --- F. App'x ---, 2014 WL 959728 (2d Cir. Mar. 13, 2014); *Moffett*, 2012 WL 3740724, at *9 (finding probable cause to seize plaintiff based on his threat to commit "suicide by cop" and his claim that the police would not have enough "firepower" to stop him); *Hoffman*, 41 F. Supp. 2d at 209–10 (finding that a psychiatrist had probable cause to involuntarily commit a plaintiff, pursuant to New York Mental Hygiene Law § 9.45, who, *inter alia*, threatened city officials with violence, did not deny those threats, had a large collection of firearms and other weapons, was thought to abuse alcohol, and was believed to have "sandbagged" his apartment as protection from an "attack"), *aff'd*, 205 F.3d 1323 (2d Cir. 2000); *Sumay v. City of New York Health & Hosp. Corp.*, No. 97-CV-3606, 1998 WL 205345, at *6 (S.D.N.Y. Apr. 28, 1998) (Sotomayor, J.) (finding hospital personnel entitled to qualified immunity based on plaintiff's prior mobile crisis unit evaluation, "hostile, loud and argumentative" demeanor, unlawful activation of the hospital's sprinkler system and paranoid delusions that he was being poisoned

by hospital staff via food and gas).

### III. Conclusion.

For the foregoing reasons, the Court declines to adopt the R&R and denies Defendants' motion for summary judgment.

SO ORDERED:

       s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2014
      Brooklyn, New York